**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Errol J. JACKSON, Milton L. Freeman,
and Frenchie R. Beckum,
Defendants–Appellants.**

Nos. 90–1836, 90–1899 & 90–3167.

United States Court of Appeals,
Seventh Circuit.

Argued June 1, 1992.

Decided Jan. 4, 1993.

R. Jeffrey Wagner (argued), Joseph R. Wall, Asst. U.S. Attys., Milwaukee, WI, for U.S.

Michael D. Monico, Barry A. Spevack (argued), Monico, Pavich & Spevack, Chicago, IL, for Errol J. Jackson.

Robert G. LeBell (argued), Styler, Kostich, Lebell & Dobroski, Milwaukee, WI, for Milton L. Freeman.

Richard L. Zaffiro (argued), West Allis, WI, for Frenchie R. Beckum.

Before CUMMINGS, FLAUM, and MANION, Circuit Judges.

MANION, Circuit Judge.

Defendants-appellants and thirteen other people were indicted for conspiracy to possess cocaine with intent to distribute, 21 U.S.C. §§ 841(a)(1) and 846, for their roles in the Cannon cocaine distribution network which operated out of Milwaukee, Wiscon-

sin from 1986 to 1989. Cocaine suppliers Billy Cannon (from whom the ring got its name) and defendant Frenchie Beckum headed the organization. Defendant Milton Freeman bought cocaine from Cannon and Beckum and regularly redistributed approximately one pound of cocaine per week. In addition, defendants Freeman and Errol Jackson were charged with money laundering, 18 U.S.C. § 1956(a)(1)(B), and structuring financial transactions to evade reporting requirements, 31 U.S.C. § 5324(3). Freeman and Jackson used drug money to buy cars and vans. Pursuant to 31 U.S.C. § 5313, financial institutions must report to the government any cash transaction of $10,000 or more. To avoid having their cash transactions reported to the government, Freeman and Jackson would pay for a car through a series of separate cash payments or cashier's checks, each for less than $10,000.

Jackson and Beckum went to trial. A jury acquitted Jackson of conspiracy, but found him guilty of money laundering and the structuring charge. He was sentenced to 20 years for money laundering and a consecutive 5 year term for the structuring offense. Beckum was found guilty of conspiracy and sentenced to 121 months. Jackson and Beckum appeal their respective convictions and sentences. Freeman pleaded guilty to one count of conspiracy and the money laundering count. He was sentenced to two concurrent 15–year sentences. Freeman appeals the district court's denial of his motion to withdraw his guilty plea and his sentence. We affirm the convictions of all defendants and the sentence of Jackson, but we vacate Beckum's and Freeman's sentences and remand for resentencing.

## I. Beckum's Appeal, No. 90–3167

Working undercover, Detective Dwayne Bishop of the Dallas, Texas Police Department first identified Beckum as a cocaine supplier in the summer of 1988. An informant, at the direction of Detective Bishop, contacted Beckum's girlfriend and ordered one-half ounce of cocaine. The informant was told that Beckum would be arriving in Texas later that day to sell the cocaine. Shortly thereafter, Beckum arrived from Milwaukee and sold the cocaine to the informant and Detective Bishop for $700. Beckum was immediately arrested; he was carrying three digital pagers.

The testimony at trial described several drug deals involving Beckum. In October 1988 Beckum and another member of the Cannon ring, Terrance Walls, sold two kilograms of cocaine to Eugene Chaney, Jr., another drug trafficker, for $40,000. In November 1988 Beckum sold cocaine to a narcotics trafficker named Rodney Smith. At Beckum's trial, Smith testified that Beckum agreed to sell Smith two kilograms of cocaine for $18,000 per kilogram. Beckum told Smith that "Terrance" would be delivering the cocaine and gave Smith a digital pager number through which Terrance could be contacted. Later, a man named "Terrance" delivered the two kilograms of cocaine, and Smith gave him $36,000. Telephone records introduced at trial corroborated Smith's story; they show him making several telephone calls from a mobile phone to Beckum's residence and Terrance Walls' pager on November 14 and 15, 1988.

On appeal Beckum challenges both his conviction and sentence. First, Beckum argues that he was deprived of his right to effective assistance of counsel. Second, Beckum contends that the district court's bias against his attorney deprived him of a fair trial. Third, he also complains about the government's exclusion of all "young adults" from the jury. Finally, Beckum disputes the district court's factual findings supporting a sentence enhancement for his role in the offense and obstruction of justice.

## A. Ineffective Assistance of Counsel

 Beckum argues that his trial counsel's performance fell so far below applicable standards that he was effectively denied his Sixth Amendment right to an attorney.[1] When reviewing an ineffective

---

1. A claim of ineffective assistance of counsel is properly brought on direct appeal if the claim is based upon alleged ineffectiveness evidenced in the trial record. *United States v. Taglia,* 922

assistance claim, we give substantial deference to the reasonable tactical decisions made by counsel. *See United States v. Muehlbauer*, 892 F.2d 664, 669 (7th Cir. 1990). In order to prevail on an ineffective assistance of counsel claim, the defendant must affirmatively establish: (1) that his attorney's performance was constitutionally deficient; and, (2) that the deficiency prejudiced the outcome of the case. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). "The defendant must overcome a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065, and the failure to establish either one of the two components is fatal to the claim." *United States v. Slaughter*, 900 F.2d 1119, 1124 (7th Cir.1990).

■ In this case, Beckum identifies nine examples of alleged ineffectiveness from the trial record, which we conclude neither individually nor cumulatively demonstrate a constitutional deprivation of the right to counsel. Beckum first takes issue with his attorney's alleged attempt at trial to show that because a jury in a different case acquitted co-conspirator Errol Jackson of conspiracy on basically the same evidence as would be used against Beckum, that the jury in this case should do the same. Beckum argues that in furtherance of this strategy the trial attorney actually presented to the jury some of the incriminating evidence which applied to both Jackson and Beckum, notably a chart used at the Jackson trial showing Beckum to be a member of the conspiracy with Jackson, and Jackson's address books which listed Beckum's telephone number. According to Beckum's analysis, this strategy failed when the district court predictably refused to allow evidence of Jackson's acquittal. Beckum contends that his attorney should have anticipated this refusal and should not have introduced the prejudicial evidence in furtherance of such a fateful strategy.

After reviewing the record, we are not convinced that the defense attorney introduced the incriminating evidence in furtherance of the failed strategy which Beckum describes. The defense attorney's stated reason for introducing the evidence was to challenge Drug Enforcement Administration Agent Robert Hartman's damaging testimony about telephone and beeper records which indicated Beckum's involvement in the conspiracy. One might reasonably infer that the trial attorney introduced the allegedly prejudicial evidence to show that even though Jackson and Beckum were supposed to have participated in the same conspiracy, there was little or no evidence of telephone contact between them. When thus viewed, the evidence tends to diminish the impact of telephone and beeper records in establishing the existence of a conspiracy. Such a strategy decision seems reasonable under the circumstances, and certainly not so indicative of incompetence as to establish an ineffective assistance of counsel claim.

■ Beckum's other examples of alleged ineffectiveness similarly lack merit.[2] Although it is true that the defense attorney informed the jury during his opening statement of Beckum's prior conviction, this does not indicate incompetence. This was simply a strategic decision to preempt the prosecutor's inevitable questions to Beckum about his prior conviction when he took the witness stand. Similarly, the defense attorney was not constitutionally deficient in his presentation of the case, because none of the failures to object, ineffectiveness in cross-examination, or failures to present evidence cited by Beckum fall outside of the wide range of reasonable professional assistance.

F.2d 413, 417 (7th Cir.), *cert. denied*, ─ U.S. ─, 111 S.Ct. 2040, 114 L.Ed.2d 125 (1991).

**2.** Beckum makes a shotgun attack on his counsel's performance, presenting a broad and encompassing list of alleged ineffectiveness. This list includes allegations that the attorney was ineffective for inept opening and closing statements, for failure to object to the introduction of certain evidence, for inept cross-examination, and for his attempt to present a double jeopardy defense and to obtain a buyer-seller instruction.

 If this panel were to conclude differently—that Beckum's counsel was deficient for some or even all of the reasons Beckum cites—the alleged errors of the defense counsel could not have caused the type of prejudice necessary to demonstrate an ineffective assistance of counsel claim.[3] The evidence against Beckum was overwhelming. Even when viewed cumulatively, the alleged errors in the defense attorney's performance did not so influence the proceedings to suggest that "but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

## B. Denial of Fair Trial

 At one point in the trial the district judge, outside the presence of the jury, criticized a question asked by Beckum's trial counsel. Beckum contends that this criticism conclusively demonstrates that he was deprived of a fair trial because the district judge lacked impartiality. We have held that mere friction between the court and counsel does not constitute bias. *F.T.C. v. Amy Travel Services, Inc.*, 875 F.2d 564, 576 n. 13 (7th Cir.1989), *cert. denied*, 493 U.S. 954, 110 S.Ct. 366, 107 L.Ed.2d 352 (1990). Apparently, Beckum seeks a new standard in this circuit—that any time a district judge criticizes a trial attorney, the judge has demonstrated his bias such that the trial may be challenged as unfair. Such a standard potentially would jeopardize on appeal every trial where the district judge acted critically towards an attorney. Because we recognize that there are times when such criticism is warranted, we do not adopt this standard. We conclude that Beckum has failed to demonstrate that he was denied a fair trial.

## C. Exclusion of "Young Adults" From the Jury

 Beckum contests the government's failure to exercise preemptory challenges of potential jurors in an age-neutral fash-

ion. We note that no court has found a Fourteenth Amendment equal protection violation based upon the exclusion of a certain age group from the jury. *Cf. Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986) (the Supreme Court held that a prosecutor's purposeful exclusion of black jurors violated a black defendant's equal protection rights). Similarly, this Circuit has specifically rejected the claim that the exclusion of a certain age group from a jury pool amounts to a Sixth Amendment violation of the right to a jury drawn from a cross-section of the community. *Silagy v. Peters*, 905 F.2d 986, 1010 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991). Accordingly, we do not find an equal protection or Sixth Amendment violation in the process of jury selection.

## D. Sentence

The presentence report prepared by the United States Probation Office calculated Beckum's base offense level at 28 and recommended a two-level increase under § 3B1.1(c) for his supervisory role in the offense, and an additional two-level enhancement under § 3C1.1 for his obstruction of justice during trial. The district court applied the two level increase under § 3B1.1(c), finding that Beckum supervised Terrance Walls in the commission of the drug crimes. The trial judge also applied the recommended two-level enhancement under § 3C1.1 for obstruction of justice, but made no independent finding on this issue.

 We review the district court's factual determinations regarding Section 3 of the Sentencing Guidelines under a "clearly erroneous" standard. *United States v. Thomas*, 870 F.2d 174, 176 (5th Cir.1989). "A finding of fact is clearly erroneous only if, after reviewing all the evidence, the appellate court is left 'with the definite and firm conviction that a mistake has been committed.'" *United States v. Brown*,

---

**3.** Especially non-prejudicial were the defense attorney's attempt to present a double jeopardy defense and to obtain a buyer-seller instruction, because both unsuccessful attempts were made outside of the presence of the jury.

900 F.2d 1098, 1102 (7th Cir.1990), quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). We conclude that the district court did not clearly err in finding that Beckum supervised Terrance Walls and in enhancing Beckum's sentence accordingly.

■ However, we are somewhat at a loss to review the district court's two level enhancement for obstruction of justice, for the simple reason that the court never expressly made a factual determination on this issue. The district court simply determined that "the two point enhancement for obstruction is appropriate" without making any specific finding as to whether Beckum committed perjury. In *United States v. Lozoya–Morales*, 931 F.2d 1216, 1219 (7th Cir.1991), we held that in order to assess a two point enhancement for obstruction of justice, "the District Court, based upon its observations of [the defendant's] testimony and other evidence, must independently determine whether the defendant lied on the witness stand." We reasoned that to otherwise penalize a defendant for his testimony has a chilling effect on the decision to testify and therefore "impinges on the right to testify in one's behalf." *Id.*

In *Lozoya–Morales* we left open the possibility that a district judge need not make an explicit finding of perjury if "the jury verdict *necessarily* establishes the falsity of [the defendant's] testimony." *Id.* at 1218 (emphasis in original). The government argues in its brief that the jury verdict necessarily established Beckum's perjury, but fails to point to any of Beckum's testimony necessarily rendered false by the jury verdict. The government summarizes the record evidence relating to Beckum's perjury as follows:

> In the instant case, Beckum testified at trial and, in great detail, denied any involvement in drug trafficking. In presenting his defense, he claimed that the various government witnesses (including police officers) all lied about his activities. (E.g., Tr. 246, 250–252, 266, 269–270). As such, he presented a version of the offense completely at odds with the version accepted by the jury beyond a reasonable doubt.

We disagree with the government's characterization of Beckum's testimony. Although Beckum attempted to create the impression by his testimony that he was not involved in drug trafficking, he never broadly denied his involvement. Rather, he denied involvement only in the specific activities about which he was questioned. For instance, Beckum specifically denied the arresting officer's testimony that he possessed drugs and money at the time of his arrest. However, Beckum was not indicted for possessing drugs and drug money or for the other specific events about which he testified—he was indicted and convicted for participation in a conspiracy. Although it may be said that by denying his participation in specific events he created the impression that he was not involved in the conspiracy, he was never asked and never testified that he was not involved in the conspiracy. Because the government fails to argue that Beckum was questioned exhaustively about all drug activity upon which he might have been convicted, we do not conclude that Beckum's repudiation of certain drug activities amounts to a blanket denial of the charges contained in his indictment—the type of denial necessarily rendered false by the jury verdict.

We agree with the government that Beckum's testimony, when read in light of the jury's verdict, strongly indicates perjury. However, this court is not empowered to make factual findings based upon the record, and because the jury's verdict did not necessarily indicate perjury, we cannot uphold the two-point enhancement for obstruction of justice absent the district court's independent finding. For this reason, we vacate Beckum's sentence and remand for resentencing. Nothing we have said is meant to discourage the district court from making any appropriate finding during resentencing.

## II. Jackson's Appeal, No. 90–1836

Errol Jackson was charged with conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1)

and 846, money laundering in violation of 18 U.S.C. § 1956(a)(1)(B), and structuring financial transactions to evade reporting requirements in violation of 31 U.S.C. § 5324(3). A jury acquitted Jackson of conspiracy but convicted him of money laundering and structuring financial transactions to evade reporting requirements. From 1977 to 1988, although reporting no income to the Internal Revenue Service, Jackson purchased numerous automobiles (including a Rolls Royce), pieces of jewelry and expensive clothing. He was convicted on the money laundering and structuring charges for his purchase of several automobiles in 1987 and 1988.

In April 1986 Jackson, using the name "Zedich Jackson," purchased a 1986 Toyota Supra from a Toyota dealership in a Milwaukee suburb for $20,000. He told the salesperson that he would be paying in cash but "did not want to pay the full amount at once." Jackson stated that "somehow he knew that if anyone under 35 years of age, if they were to bring $10,000 cash in, [the car dealer] would have to report that." Accordingly, on April 29, 1986, Jackson produced $1,000 in cash from his sock and gave it to the sales person as a down payment. Between April 30 and May 2 Jackson made seven payments to the dealership: five cash payments ranging from $25 to $4,000 and two payments in cashier's checks (one payment of two cashier's checks totalling $2,000 and the other of four checks totalling $6,772.25). Receipts for these payments, like the purchase contract, listed "Zedich Jackson" as the payor. Slightly over a year later, in June 1987, Jackson purchased a Ford Escort from a Ford dealership in Milwaukee. The first purchase contract showed Errol Jackson as the purchaser. However, at Jackson's request, the contract was voided and a new one drafted naming the purchaser as "Kindle Miles." As with the Toyota, Jackson produced a cash down payment for the car from his sock. And between June 27 and June 29 Jackson made three separate cash payments for the car, all under $10,000. Finally, in October 1987 Jackson purchased a white 1987 Saab Turbo 9000 for $26,585 from the Jeffords Motor Car Company in Milwaukee. He instructed the salesperson to list "Marion Jackson" on the purchase contract and signed it accordingly. On October 6, 1987 he made a down payment of $466 in cash for the car. On October 8, 1987 he gave the dealership $8,000 in cash and five cashier's checks for a total of $18,500. The cashier's checks had all been purchased on October 8, with cash, at five separate banks; the checks ranged in amounts from $3,000 to $5,000 and showed "Marion Jackson" as the remitter.

Jackson raises four issues on appeal. He first argues that the money laundering statute, 18 U.S.C. § 1956, and the anti-structuring statute, 31 U.S.C. § 5324, are unconstitutionally vague. Next, Jackson contends that the evidence was insufficient to support his convictions. He also challenges the district court's jury instruction on money laundering. Finally, Jackson argues that the district court's imposition of consecutive sentences for the money laundering and structuring convictions violated the Double Jeopardy Clause.

## A. Void for Vagueness

We first address Jackson's argument that the money laundering statute, 18 U.S.C. § 1956, and the anti-structuring statute, 31 U.S.C. § 5324(3), are so vague as to violate his due process rights. "[T]he void-for-vagueness doctrine requires only that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Server v. Mizell*, 902 F.2d 611, 613 (7th Cir.1990), quoting *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). The issue presented is whether the statute is so vague that an ordinary person could not reasonably understand that the defendant's conduct was proscribed.

### 1. Money Laundering.

 As applied to Jackson, we conclude that 18 U.S.C. § 1956 is not unconstitution-

ally vague. 18 U.S.C. § 1956(a)(1)(B) provides as follows:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

....

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

In *United States v. Jackson*, 935 F.2d 832, 838 (7th Cir.1991), this court rejected a vagueness challenge to section 1956(a)(1)(B) almost identical to the challenge that Jackson makes in this appeal. This court noted that the statute requires the government to prove that the defendant knew the transaction identified in the indictment involved the proceeds of unlawful activities. Furthermore, the government must prove that the transaction was designed to conceal one or another of the enumerated attributes of the proceeds involved. *Id.* at 838–39. These intent and knowledge requirements weaken any argument that the statute is unfair. *Id.* at 839. Furthermore, as the *Jackson* court noted, the specific and detailed definitions given to its numerous terms suggest that Congress did not abdicate its responsibilities in delineating the proscribed conduct. *Id.*

■■■■■ In this appeal, Jackson maintains that the phrase "involves the proceeds of" unlawful activity is vague because it does not specify what proportion of a financial transaction must involve illegal proceeds, that is, whether the pertinent transaction must involve "all" or only "some" illegal proceeds. The use of the

word "proceeds" in the context of the money laundering statute is not ambiguous. *United States v. Mainieri*, 691 F.Supp. 1394, 1397 (S.D.Fla.1988). Furthermore, by using the word "involves," Congress has indicated that it does not intend for defendants to be able to avoid the sanction of the statute by commingling funds. *Jackson*, 935 F.2d at 840. The word "involves" plainly means something less than "all," but it is not necessary for the statute to contain a more exact term. In short, we find no merit to Jackson's vagueness challenge to the money laundering statute.

2. Structuring.

■■■■■ Similarly, we reject Jackson's vagueness challenge to the anti-structuring statute. Section 5324(3) provides:

No person shall for the purpose of evading the reporting requirements of section 5313(a) with respect to such transaction—

. . . . .

(3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

Jackson points out that the statute does not define "structuring" but that alone does not render the statute void for vagueness. This court already rejected an argument identical to Jackson's in *United States v. Davenport*, 929 F.2d 1169, 1173 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 871, 116 L.Ed.2d 776 (1992), and we need not dwell long on it here. We note in addition that, contrary to Jackson's contentions, the legality of structuring in certain circumstances does not render the statute vague. The scienter requirement significantly diminishes the statute's susceptibility to discriminatory enforcement. *Id.; see also Server*, 902 F.2d at 614 (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 500, 102 S.Ct. 1186, 1194, 71 L.Ed.2d 362 (1982)); *United States v. Hoyland*, 903 F.2d 1288, 1292 (9th Cir.1990) ("Only the person who has a deliberate intention to frustrate the

reporting by the banks is guilty of the offense.").

### B. Sufficiency of the Evidence

Jackson argues that the government did not produce sufficient evidence to convict him of the money laundering count or of structuring transactions to avoid the reporting requirements or conceal the nature and source of the proceeds. When considering a challenge to the sufficiency of the evidence, the court must view the evidence in the light most favorable to the government and determine whether "substantial evidence" supports the jury's verdict. *E.g., United States v. Durrive*, 902 F.2d 1221, 1229 (7th Cir.1990). Furthermore, we will "accept circumstantial evidence as support, even sole support, for a conviction." *Id.*

#### 1. Money Laundering.

Tracking section 1956, as set out above, the district court instructed the jury that the government had to prove beyond a reasonable doubt that: (1) Jackson conducted a financial transaction involving property that represented proceeds of dealing in controlled substances; (2) Jackson knew that the property represented the proceeds of dealing in controlled substances; and (3) Jackson knew that the transaction was designed in whole or in part to conceal the nature and location, source, ownership or control of the proceeds of dealing in controlled substances and to avoid a transaction reporting requirement under federal law.[4] Jackson does not challenge these instructions. Instead he argues that the government did not prove that the proceeds used to purchase the car arose from dealing in controlled substances or that Jackson knew his conduct was illegal. However, we conclude that substantial evidence supports the conviction.

Specifically, Jackson maintains that the government piled inference upon inference

to meet its burden in this case. He relies on this court's decision in *United States v. Sullivan*, 903 F.2d 1093 (7th Cir.1990). In *Sullivan* the government maintained that the defendant, who had arrived in Union Station with a duffle bag full of cocaine, must have conspired with someone to distribute cocaine because of the quantity and purity of the drugs he possessed, his use of an alias, and his lack of funds and other baggage. *Id.* at 1099. This court acknowledged that to prove conspiracy, the government may rely on circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts and the totality of their conduct. *Id.* at 1098. The court concluded, however, that the defendant's conviction for conspiracy was not based on inferences from facts but on conjecture. *Id.* at 1099.

Any analogy between this case and *Sullivan* fails. The money laundering count involved Jackson's purchase of the Saab in October 1987. Contrary to Jackson's contentions, six witnesses indicated that Jackson was involved in selling cocaine (Cannon, Verser, Turnage, Teamer, Thurgood, and Gransberry); and four of those witnesses (Cannon, Verser, Turnage, and Donald) indicated that Jackson had provided cocaine to them or discussed providing cocaine to them at approximately the time he purchased the Saab. With this testimony, together with evidence of Jackson's unexplained, substantial wealth, the jury could reasonably conclude that Jackson was involved in drug trafficking in October 1987 without resorting to pure conjecture. As the Eighth Circuit pointed out in *United States v. Blackman*, 904 F.2d 1250, 1257 (8th Cir.1990), the statute does not require that the government trace the proceeds to a particular sale.

The jury acquitted Jackson of conspiracy, and from that acquittal Jackson asks us to

---

**4.** The third prong of the instruction required the government to prove both concealment of drug proceeds *and* the avoidance of reporting requirements. The government objected to this instruction, because Section 1956(a)(1)(B) presents these elements in the disjunctive, requiring proof only of concealment *or* avoidance. Even with a higher burden of proof than was argu-

ably mandated by the statute, the government prevailed in gaining conviction, and the propriety of the instruction is not an issue raised on appeal. Therefore our discussion of the sufficiency of the evidence to support conviction under the given instruction should not be construed as an endorsement of the instruction.

deduce that the jury disbelieved the witnesses against him. But Jackson makes too much of the acquittal. While the jury may not have believed that he was involved in the Cannon conspiracy as alleged in Count I, it could still believe that Jackson derived the proceeds used to purchase the Saab from drug transactions.

Finally, Jackson argues that there was no evidence that he knew his conduct was illegal. The record refutes this contention. For example, when Jackson purchased the Toyota Supra under an assumed name, he told the saleswoman that he knew about the reporting requirements:

Q: Did you have a discussion with Mr. Jackson on how he was going to pay for that car?

A: Yes. He said he was paying cash.... He did give me thousand dollars deposit when we first agreed up on a price, and he said he did not want to pay the full amount at once because whatever the problem there may be it was personal. And he also stated that somehow he knew that if anyone under thirty-five of age, if they were to bring $10,000 cash in, we would have to report that.

As previously stated, Jackson returned to the dealership with seven payments varying in amount from $25 to $6,772.25 in either cash or cashier's checks. In addition, when Jackson sold Cannon a Cadillac in 1987, he falsely reported the purchase price as $9,500 and told Cannon that he did so to avoid having the sale reported to the Internal Revenue Service. From this evidence, the jury could readily conclude that, when Jackson purchased the Saab by means of multiple payments in cash and cashier's checks, each for less than $10,000, he knowingly structured the transaction to avoid the reporting requirements.

2. Structuring.

The district court instructed the jury that in order to sustain the charge under 31 U.S.C. § 5324 the government had to prove beyond a reasonable doubt that: (1) the defendant structured a transaction with one or more domestic financial institutions as alleged in the indictment; (2)

the defendant did so knowingly and willfully; and (3) the defendant did so for the purpose of evading the currency reporting requirements of the law. The court then added that "[i]n order to prove that the defendant acted to avoid a transaction reporting requirement, the Government must show beyond a reasonable doubt that the defendant knew the actions he took in avoiding the requirement violated the law." The court also read section 5324 to the jury.

Although the jury found Jackson guilty, the instruction imposed a higher burden on the government than the statute requires. The instruction required the government to prove that the defendant actually knew structuring was unlawful. The circuits which have addressed this question, however, require the government to prove only that a defendant had knowledge of the reporting requirements and acted to avoid them. *United States v. Gibbons*, 968 F.2d 639, 644 (8th Cir.1992); *United States v. Caming*, 968 F.2d 232, 238–39 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 416, 121 L.Ed.2d 339 (1992); *United States v. Rogers*, 962 F.2d 342, 344 (4th Cir.1992); *United States v. Brown*, 954 F.2d 1563, 1568 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 284, 121 L.Ed.2d 210 (1992); *United States v. Dashney*, 937 F.2d 532, 537–38 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 402, 116 L.Ed.2d 351 (1991); *United States v. Wollman*, 945 F.2d 79, 81 (4th Cir.1991); *United States v. Hoyland*, 914 F.2d 1125, 1129 (9th Cir.1990); *United States v. Scanio*, 900 F.2d 485, 489–90 (2d Cir.1990). We join these circuits in concluding that "[b]y its plain language, § 5324(3) is violated when an individual structures a currency transaction with the intent to evade § 5313's reporting requirements," *Scanio,* 900 F.2d at 489, and that "[a] criminal violation of § 5324(3) may be established without proof that the defendant knew that structuring was unlawful." *Id.* at 491. Under this test, we conclude that sufficient evidence supports the jury's finding that Jackson structured a currency transaction with the intent to evade the reporting requirements. Under the district

court's instruction, to find Jackson guilty of structuring, the jury had to conclude that Jackson "knew that the actions he took in avoiding the [reporting] requirement violated the law." In order to know that he was violating the law, Jackson would first have to intend to avoid the reporting requirements. Thus to hold as it did the jury also had to conclude that Jackson acted "for the purpose of evading the reporting requirement." Moreover, the testimony of several witnesses established that Jackson knew that cash transactions over $10,000 had to be reported. In buying the Toyota, Jackson paid in installments of less than $10,000 each (some in cash and some in cashier's checks). In buying the Saab, Jackson used five separate cashier's checks from five different banks purchased on the same date. By looking at Jackson's statements and his past conduct, the jury reasonably could have inferred that Jackson's decision to visit five banks on the same day and obtain five cashier's checks each for under $10,000 was not happenstance but was for the purpose of evading the reporting requirements.

Jackson argues further that there is no evidence that he structured anything since the name "Marion Jackson" appears on the cashier's checks. Jackson contends that the jury had to speculate that he (as opposed to "Marion Jackson") structured the transaction. The record contains sufficient evidence, however, for the jury to infer that Errol Jackson posed as Marion Jackson and structured the transaction: he signed the purchase contract as "Marion Jackson" in the presence of the salesperson; he subsequently drove the Saab or directed others to do so; witnesses referred to the Saab as Errol Jackson's Saab; and as late as January 1989 the Saab was parked outside Errol Jackson's residence. This evidence was sufficient for the jury to infer that Jackson purchased the car but used a false name—particularly in light of the absence of any evidence of a person named Marion Jackson. Because Jackson purchased the car posing as Marion Jackson, the jury could also reasonably infer that he obtained the cashier's checks as Marion Jackson.

## C. Jury Instruction

After the jury began its deliberations, it sent out a note asking whether "all of the laundering [had] to be from drug money or just part?" The trial judge instructed the jury that "[t]he financial transaction does not have to involve drug money. However, a *substantial* portion of the funds involved in the transaction must involve the proceeds of illegal drug activity." (Emphasis added.) Jackson contends that this instruction was wrong and that the jury should have been instructed that he could not be convicted unless *all* of the proceeds in the transaction were derived from drug activities. Again, if anything, the instruction imposes a heavier burden on the government than necessary. We held in *Jackson* that sections "1956(a)(1)(A)(i) and (a)(1)(B)(i) allow for convictions where the funds involved in the transaction are derived *only in part* from 'specified unlawful activities'." *Jackson*, 935 F.2d at 840 (emphasis added). The court noted that the risk of this reading of the statute having unduly harsh consequences is mitigated by the knowledge and intent requirements of the statute. It also noted that "[i]t will be a rare case in which these requirements will be satisfied without proof that the funds used in the charged transaction were derived in substantial measure from 'specified unlawful activities' rather than from other legal or illegal conduct," but it did *not* require that a substantial portion of the funds be from drug activity. *Id.* at 840. In fact the court found that commingling legal money with illegal was suggestive of a design to hide the source. Therefore, the judge's instruction requiring that a substantial portion of the funds be derived from drug activity actually benefitted Jackson and does not justify the reversal of his conviction on Count II.

## D. Sentence

The Fifth Amendment's Double Jeopardy Clause provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const.Amend. V.

The Double Jeopardy Clause affords three protections to a criminal defendant. The first is a protection against a second prosecution for the same offense after acquittal. The second is a protection against a second prosecution for the same offense after conviction. *Jones v. Thomas*, 491 U.S. 376, 380–81 [109 S.Ct. 2522, 2525, 105 L.Ed.2d 322] (1989). [T]he third [is a] protection against multiple punishments for the same offense. *See North Carolina v. Pearce*, 395 U.S. 711, 717 [89 S.Ct. 2072, 2076, 23 L.Ed.2d 656] (1969).

*United States v. Church*, 970 F.2d 401, 407 (7th Cir.1992), *petition for cert. filed*, (Nov. 9, 1992) (No. 92–6586). Invoking the third protection, Jackson challenges the imposition of consecutive sentences for violations of 18 U.S.C. § 1956 and 31 U.S.C. § 5324.

Count 2 of the indictment charged that Jackson knowingly laundered proceeds of cocaine dealing when he purchased the Saab in violation of section 1956. Count 3 of the indictment charged that by purchasing five cashier's checks, Jackson structured a transaction with domestic financial institutions to evade the reporting requirements. Jackson argues that obtaining the cashier's checks and using them to purchase the Saab was all part of the same continuing conduct and should not be punished separately. We think our reasoning in *Church* demonstrates that Jackson's Fifth Amendment rights have not been violated.

In *Church* the defendant argued that sentencing him for conspiracy to distribute cocaine and conspiracy to maintain a place for the distribution of cocaine violated the Double Jeopardy Clause because his conduct furthered a single criminal objective. This court reasoned that under *Garrett v. United States*, 471 U.S. 773, 778, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764 (1985), the key inquiry was whether Congress intended that each violation be a separate offense. *Church*, 970 F.2d at 407. While the Su-

preme Court's test under *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) [5] is a rule of statutory construction, it "is not controlling when the legislative intent is clear from the fact of the statute or the legislative history." *Church*, 970 F.2d at 407, quoting *Garrett*, 471 U.S. at 779, 105 S.Ct. at 2411. A similar analysis applies in this case. In section 1956, included in the racketeering section of the United States Code, Congress plainly sought to punish the concealment of ill-gotten gains. In section 5324, included in the Money and Finance section of the United States Code, Congress plainly sought to punish efforts to deprive the government of information that has "a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." 31 U.S.C. § 5311. In addition, sections 1956 and 5324 require proof of different facts. In this case, the money laundering statute, section 1956, had to have involved proceeds from some unlawful (drug) activity, a fact not necessary under section 5324. Since we conclude that Congress contemplated different offenses in section 1956 and section 5324, Jackson's Fifth Amendment rights were not violated by the consecutive punishments imposed for Count 2 and Count 3 in the indictment.

### III. Freeman's Appeal, No. 90–1899

Milton Freeman became involved in cocaine trafficking in approximately mid–1986, when he began purchasing small quantities of cocaine for redistribution. In 1987 Freeman purchased cocaine from, among others, Billy Cannon. Freeman regularly distributed approximately one pound of cocaine per week and occasionally acted as a middleman for kilogram-size transactions between his customers and Cannon. During the summer of 1988, Freeman received and redistributed approximately seven kilograms of cocaine from Beckum. Freeman's cocaine activities halted on January 3, 1990, when he pleaded guilty to one

**5.** "In *Blockburger*, the Supreme Court stated that 'where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.' 284 U.S. at 304, 52 S.Ct. at 182." *Church*, 970 F.2d at 407.

count of conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) & 846. In addition to the conspiracy charge, Freeman also pleaded guilty to one count of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B).

### A. Motion to Withdraw the Guilty Plea

After obtaining new counsel, Freeman filed a motion to withdraw his pleas. After a hearing the district court denied the motion and sentenced him to 15 years imprisonment for each count, to be served concurrently. Federal Rule of Criminal Procedure 32(d) permits a defendant to move for a withdrawal of a guilty plea prior to sentencing, which the court may grant "upon a showing by the defendant of any fair and just reason." *See Kercheval v. United States*, 274 U.S. 220, 224, 47 S.Ct. 582, 583, 71 L.Ed. 1009 (1927). On this issue the defendant bears the burden, and we defer to the district court's discretion. *United States v. Saenz*, 969 F.2d 294, 296 (7th Cir.1992); *United States v. Thompson*, 680 F.2d 1145, 1151 (7th Cir.1982), *cert. denied*, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983). At the hearing on his motion to withdraw his guilty pleas, Freeman argued that prior to his pleas he had not understood the consequences of the Sentencing Guidelines. Additionally, he claimed that his attorney told him that a jury trial would not be possible without a substantial increase in the attorney's fee, which Freeman could not secure.

 The government presented no evidence of its own, instead relying on the cross-examination of Freeman and a written plea agreement that Freeman had signed.[6] Initially the court found that Freeman was familiar with the contents of the written plea agreement. That agreement specifically listed the crimes to which Freeman pleaded guilty (and that the con-

spiracy charge carried a minimum sentence of ten years to a maximum of life) and an acknowledgement that Freeman "understands that any sentence imposed by the court will be pursuant to the Sentencing Reform Act and the Sentencing Guidelines." Of particular note to the court was the one hour recess that had occurred while the parties negotiated out a portion of the plea agreement calling for Freeman's cooperative testimony. While Freeman testified as to what he did not know prior to his pleas, the agreement provided the court with evidence of what Freeman did know. The court found Freeman "a person who gets about as close to the truth as Superman gets to kryptonite." We conclude that the district court did not clearly err in disbelieving Freeman nor abuse its discretion in denying the plea withdrawals.

 By rejecting Freeman's credibility the district court had no reason to reach whether his allegations, if true, would have constituted a fair and just reason to allow a plea withdrawal. *United States v. Caban*, 962 F.2d 646, 649 (7th Cir.1992); *cf. United States v. Trussel*, 961 F.2d 685, 689 (7th Cir.1992) (the court need only grant an evidentiary hearing where the defendant's motion presents a fair and just reason for withdrawing the plea). Even if the district court had believed Freeman, he could not have withdrawn his guilty pleas because he underestimated the Sentencing Guideline range. *United States v. Scott*, 929 F.2d 313, 315 (7th Cir.1991) (the defendant's incorrect sentence estimate offers no fair and just reason for withdrawing a guilty plea); *accord United States v. Coonce*, 961 F.2d 1268, 1275–77 (7th Cir.1992); *United States v. Knorr*, 942 F.2d 1217, 1220–21 (7th Cir. 1991). We need not reach the issue of whether an attorney who coerces guilty pleas by asking the defendant for more

---

**6.** Freeman introduces in his reply brief a new argument that the district court failed to address Freeman personally, in open court rather than through the written agreement, concerning his understanding of the pleas. He raises this issue too late. *See* Circuit Rule 28(f) (reply brief limited to matters in reply). And we will not entertain any argument based upon Federal Rule of Criminal Procedure 11. *Colburn v.*

*Trustees of Indiana University*, 973 F.2d 581, 588 (7th Cir.1992); *Finsky v. Union Carbide & Carbon Corporation*, 249 F.2d 449 (7th Cir.1957), *cert. denied*, 356 U.S. 957, 78 S.Ct. 993, 2 L.Ed.2d 1065 (1958). *See Marx v. United States*, 930 F.2d 1246, 1250 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1480, 117 L.Ed.2d 623 (1992).

money to try the case raises a fair and just reason to allow the defendant to withdraw his guilty pleas.

## B. Sentence

Freeman presents us with three challenges to his sentence. First, application of the federal Sentencing Guidelines to this case violates his constitutional rights against *ex post facto* laws. Second, the court did not properly articulate its findings regarding his relevant conduct for sentencing purposes (that is, the kilograms involved in the furtherance of the conspiracy). Third, the court improperly sentenced him on the money laundering count to a concurrent and identical fifteen year sentence with the conspiracy count. We reject Freeman's first contention, but remand for resentencing based upon the latter two.

 Freeman pleaded guilty to a conspiracy that began in January 1986 and ended in June 1989. The conspiracy bracketed the effective date of the Sentencing Guidelines (November 1, 1987). Freeman argues that the court cannot apply the Sentencing Guidelines in this case without violating his constitutional protection from *ex post facto* laws. Not so. Freeman cannot maintain this argument while admitting that his conspiracy continued after the Guidelines went into effect. *United States v. Edwards*, 945 F.2d 1387, 1390–91 (7th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992). ("[A] conspiracy that began before the Guidelines went into effect but continued after the Guidelines became law is within the scope of the Guidelines."); *United States v. Osborne*, 931 F.2d 1139, 1144 (7th Cir. 1991); *United States v. Fazio*, 914 F.2d 950, 958–59 (7th Cir.1990). He could have avoided imposition of the Sentencing Guidelines by ceasing the criminal conspiracy prior to November 1987. But he continued, and the new sentencing provisions justly apply.

On April 10, 1990, the district court sentenced Freeman to fifteen years imprisonment. The record before the court consisted of Freeman's guilty plea on the conspiracy count, which involved in excess of five kilograms of cocaine, and the government's presentence report, which stated the conspiracy involved at least fifty kilograms of cocaine. Freeman objected to the weight of cocaine attributed to him and requested an evidentiary hearing on the matter. The court, however, found that a hearing was not necessary and summarily adopted the conclusions in the presentence report.

 Under the Guidelines a conspiracy defendant's sentence should reflect the kilograms involved in the furtherance of the conspiracy—the amount which was known or reasonably foreseeable to the defendant. *United States v. Morrison*, 946 F.2d 484, 501 (7th Cir.1991), *cert. denied*, — U.S. —, 113 S.Ct. 826, 121 L.Ed.2d 696 (1992) ("Those convicted of conspiring to violate the drug laws are criminally responsible for the total quantity of drugs in which the conspiracy they joined can reasonably be established to have dealt."); *United States v. Guerrero*, 894 F.2d 261, 265–66 (7th Cir.1990). In determining the kilograms involved, the district court must state supportive reasons, not adopt mere conclusions. *Edwards*, 945 F.2d at 1399 ("Before concluding that a given quantity of drugs was foreseeable for sentencing purposes, the district judge should make clear that he has considered the evidence of the individual defendant's agreement to join a conspiracy of the scope alleged by the government."). The court's documentation efforts aid the defendant in understanding the sentence, allow the appellate courts to review and more quickly resolve subsequent disputes and provide guidance to those persons involved in shaping the application of the Sentencing Guidelines. *See Morrison*, 946 F.2d at 501–02; *United States v. Scroggins*, 939 F.2d 416, 424 (7th Cir.1991).

 At the sentencing hearing in this case the government bore the burden of proof by a preponderance of evidence that Freeman's relevant conduct for sentencing purposes involved fifty kilograms. *United States v. Banks*, 964 F.2d 687, 692 (7th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 470, 121 L.Ed.2d 377 (1992). However, the record does not reflect that the

court resolved Freeman's disputed issues of fact, and the government conceded at oral argument that the case should be remanded for a hearing to articulate the appropriate relevant conduct for sentencing purposes. *United States v. Duarte*, 950 F.2d 1255, 1263 (7th Cir.1991), *cert. denied*, — U.S. ——, 113 S.Ct. 174, 121 L.Ed.2d 120 (1992) ("a district court should explicitly state and support, either at the sentencing hearing or (preferably) in a written statement of reasons, its findings that the unconvicted activities bore the necessary relation to the convicted offense"). *See also United States v. Terry*, 900 F.2d 1039, 1044 (7th Cir.1990) (wherein the government conceded the issue in a similar case). We follow accordingly and hold that the district court failed to support its findings in the record when it assigned fifty kilograms as Freeman's relevant conduct in the conspiracy. We take no position concerning the relevant conduct the district court may find on remand.

▉ Regarding the money laundering count, the presentence report assigned an offense level of 23 and the court listed Freeman at criminal history category II. He argues that this binds the court to sentence him on the money laundering count to between 51 and 63 months. The court, however, without any discussion, sentenced Freeman to a concurrent 15 year sentence with the conspiracy count. *See United States v. Franklin*, 902 F.2d 501, 503 (7th Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 274, 112 L.Ed.2d 229 (1990), (the district court sentenced the defendant to 148 months on each count of money laundering and possession of cocaine with intent to distribute). Freeman appeals pursuant to 18 U.S.C. § 3553(c)(2) because the district court failed to articulate any reason for imposing a different sentence than the Guideline describes. The government responds that Guideline section 3D1.2 provides that all counts involving substantially the same harm should be grouped together.

The Seventh Circuit has not reached the precise argument raised by the government; that is, whether conspiracy to distribute drugs and money laundering should be grouped for sentencing purposes. An opportunity to address this issue came to us in *United States v. Atterson*, 926 F.2d 649, 659 (7th Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 2909, 115 L.Ed.2d 1072 (1991), but the parties did not raise the issue. In *Atterson* a jury convicted defendant Laurelez of possession with intent to distribute marijuana and money laundering. The district court assigned an offense level of 28 regarding the drugs and 29 regarding the money laundering. The money laundering indictment reflected only $24,561; however, for sentencing purposes the court included the value of the marijuana involved in the drug count, thus finding the money laundering scheme exceeded $100,000.

The Guideline governing money laundering transactions mandates a sentence enhancement in the event that defendant knew that the funds involved in the money laundering scheme were the proceeds of unlawful activity involving narcotics or other controlled substances. The district court increased Laurelez' sentence three levels under this Guideline since Laurelez knew that the funds represented proceeds from the marijuana distribution. To then include the value of those drugs in computing the total value of the funds involved in the money laundering scheme would result in Laurelez' sentence being doubly-enhanced due to the fact that drugs were involved in the money laundering scheme, a result we do not think Congress intended in enacting this particular Guideline.

*Atterson*, 926 F.2d at 660. We held that the value of drugs involved in a conspiracy could not be added to the "value of the funds" involved in the money laundering where the court enhances a defendant's sentence based on his knowledge that the laundered money involved drug proceeds. *Id.* Whether the defendant was actually convicted of a drug conspiracy did not affect the decision. But obviously the case involved two separate sentences; conspiracy to distribute drugs and money laundering were not grouped together for sentencing purposes. *See, e.g., United States v. Barton*, 949 F.2d 968, 969 (8th Cir.1991)

(the district court sentenced the defendant to 120 months for possession of marijuana with intent to distribute and 136 months for money laundering).

To date no circuit has concluded that drug offenses and money laundering must be grouped together. The Fifth and Eleventh Circuits have addressed the issue and ruled that the district courts did not commit error in deciding not to group these offenses. *United States v. Gallo*, 927 F.2d 815, 823–24 (5th Cir.1991); *United States v. Harper*, 972 F.2d 321, 322 (11th Cir. 1992). In each, the courts looked to the factual relationship between the money laundering and drug offenses. In light of the government's concession that the district court must re-conduct a sentencing hearing on the conspiracy count, and because the parties have each devoted a slim two pages of briefs on the money laundering sentence (with no supportive case law), we decline to tie the district court's hands. Whether the court determines the counts should be separable or grouped, the record should reflect sufficient reasons. *See* United States Sentencing Commission, *Guidelines Manual*, § 3D1.2 (Nov.1991). For the foregoing reasons we vacate Freeman's sentence and remand this case for resentencing.

## IV. Conclusion

The convictions of all the defendants and the sentence of Jackson are AFFIRMED. We VACATE the sentences of Beckum and Freeman and REMAND this case for resentencing in accordance with the foregoing opinion.