**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael Stacy BROWN and John Clague,
Defendants–Appellants.**

Nos. 93–1762 & 93–1837.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 10, 1993.

Decided Aug. 1, 1994.

Christopher W. Dysart, Robert Coleman (argued), Office of U.S. Atty., Crim. Div., Fairview Heights, IL, for U.S.

Phillip J. Kavanaugh (argued), Office of Federal Public Defender, East St. Louis, IL, for Michael S. Brown.

James Hackett (argued), Edwardsville, IL, for John Clague.

Before CUMMINGS, FRIEDMAN * and CUDAHY, Circuit Judges.

* The Honorable Daniel M. Friedman of the United States Court of Appeals for the Federal Circuit is sitting by designation.

CUDAHY, Circuit Judge.

This is an appeal from convictions for bank fraud, money laundering, and conspiracy to commit bank fraud and money laundering, in violation of 18 U.S.C. §§ 371, 1344, & 1956. We affirm.

I.

Visa and Mastercard are associations of banks which facilitate the authorization and posting of credit card transactions. "Issuing banks" in these associations issue cards to consumers. "Merchant signing banks" sign merchants to contracts allowing the latter to gain access to credit card funds. For in-person charges, the merchant deposits completed charge slips (i.e., imprints carrying a signature) in an account with his signing bank, much as he would deposit checks from customers. The signing bank then pays the merchant, thereby extending credit solely in reliance on the merchant's agreement to comply with the requirements of both the bank and the credit card association. Merchant signing banks use these slips as proof that a cardholder authorized a charge if the cardholder contests the charge on his bill. In a telephone transaction, however, there is no signature and thus no proof that the cardholder authorized the charge. Because of the increased risk of telephone purchases, signing banks generally prohibit merchants from depositing charges developed from telemarketing. (Those banks that do accept telemarketing charges do so only at a higher fee.) The general prohibition on telemarketing charges is, in part, implemented by preventing telemarketers who cannot (or who decline to) obtain an account with a signing bank from laundering their credit transactions through another merchant who is able to obtain a valid account. Banks usually can discover when a merchant is third-party processing, but this may take days or weeks.

The government here presented testimony and other evidence to prove a complex conspiracy involving several merchants, tele-

marketers and various intermediaries whose interwoven relationships changed frequently over the course of several months, and some simplification is necessary. In the alleged scheme, while John Clague owned a telemarketing business, Michael Brown served primarily as an intermediary. The scheme also involved a third man, Ray Carlton. Carlton responded to a newspaper notice placed by Brown seeking merchant accounts. Brown called Carlton, using a false name. Carlton Tr. 5–6, 15. Brown explained that telemarketers had trouble getting authorization for merchant accounts and that banks freeze accounts if they discover that a merchant is third-party processing. Carlton Tr. 8. Carlton agreed to find merchant accounts willing to process Brown's telemarketing charges for him. Carlton Tr. 9.

Carlton found a series of merchants who were willing to process third-party credit card charges. The first merchant began by processing the telemarketing charges of a party other than the appellants. Carlton Tr. 9–15. She soon thereafter, however, became involved in processing charges on behalf of Brown and Clague. Carlton Tr. 17, 21. After a few weeks, the bank froze her account. In a conference call, Carlton and Brown told Clague they hoped the frozen account would be reopened. Carlton Tr. 23. Clague responded that he had never seen an account suspected of third-party processing reopened. Clague then asked Carlton if he had any other merchant accounts that could be used. Carlton Tr. 23.

Carlton found at least five other people who had or who agreed to open merchant accounts. He informed these people that banks would close their accounts if they were found to be third-party processing, since several banks had made it clear that merchant accounts could not engage in such activities. Tr. 39–41, 53–54, 64, 162. Carlton told at least one account holder to lie to her bank. Carlton Tr. 63; Tr. 120–21, 166. Several account holders subsequently misrepresented their activities to their banks. Tr. 55–56, 59, 106; Carlton Tr. 37–39. Brown and Clague remained involved in Carlton's activities in that his account holders ultimately processed charges for both Clague's business and the telemarketers found by Brown. Further, there is evidence that both Clague and Brown discouraged potential merchants from revealing their third-party processing activities to banks. Tr. 193–97, 246–56, 258, 268; Carlton Tr. 8, 23–27, 43–45; Yale Tr. 41. Brown and Clague dealt with the account holders either directly or through Carlton. Carlton Tr. 26–33, 37–39, 43–45, 61; Tr. 109, 111. They submitted telemarketing credit charges to the merchant accounts and, in return, received cash disbursements. In some instances, Carlton earned a percentage of the proceeds of the appellants' charges, as did some of the merchant account holders. Carlton Tr. 39–56; Yale Tr. 17, 26–33. Brown and Clague both requested that Carlton find additional accounts in order to counteract the banks' efforts to close accounts suspected of third-party processing. Carlton Tr. 15–23, 49–53. As each of the merchant accounts closed due to bank suspicions, Brown and Clague would ask Carlton to find them new merchant accounts. They also attempted to ensure that the typical size of each telemarketing charge processed through an account was consistent with the purpose and nature of that account, as represented to the bank by the merchants who participated in the alleged scheme. Carlton Tr. 23–27, 43–45. There is evidence that at least two of the banks disbursed substantial sums as a result of the scheme. Tr. 70, 169.

At trial, a postal inspector testified that he had conducted undercover interviews with both Brown and Clague. He secretly recorded twenty conversations with Brown, during which Brown displayed considerable knowledge about telemarketing, third-party processing, banking and the credit card system. When the inspector pretended that he would process charges for Brown, Brown allegedly discouraged him from telling the bank the truth and suggested that, if necessary, he should tell the bank that he was selling products. Tr. 246–56, 258. Brown also told the inspector not to mention telemarketing to the banks. Tr. 258. Further, Brown told the inspector not to leave much money in any merchant account because the bank might close the account and he would lose the money. Tr. 265. In interviewing Clague, the inspector learned of Clague's arrange-

ments with some of the merchant accounts located by Carlton. Tr. 343–45. Clague also said he knew that banks close accounts as soon as they discover third-party processing, usually only a few weeks after such processing begins. Tr. 345. The inspector testified that he informed the appellants in February of 1991 that their activities were unlawful. This was well before their third-party processing activities ended. Tr. 331.

Based on this evidence, Brown and Clague were convicted of conspiracy to commit bank fraud and money laundering in violation of 18 U.S.C. § 371, bank fraud in violation of 18 U.S.C. § 1344 and money laundering in violation of 18 U.S.C. § 1956. Brown was given concurrent sentences of 60 months for violating § 371 and 108 months for violating § 1344 and § 1956. Clague was given concurrent sentences of 60 months for violating § 371 and 97 months for violating § 1344 and § 1956. These defendants contend primarily that there was insufficient evidence to support their convictions. In addition, they argue that the district court abused its discretion in allowing certain testimony under Fed. R.Evid. 404(b) and that the district court committed reversible error in determining their sentences.

## II.

■ We review a sufficiency of the evidence challenge to determine whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have concluded that the defendant was guilty of the crime charged beyond a reasonable doubt. *United States v. Goines,* 988 F.2d 750, 758 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 241, 126 L.Ed.2d 195 (1993). This standard is highly deferential and we will reverse only if there is *no* evidence, even circumstantial evidence, from

which a jury could have found the defendant guilty. *United States v. Durrive,* 902 F.2d 1221, 1225 (7th Cir.1990).

Brown and Clague argue that they were not guilty of conspiracy because they lacked criminal intent and, in any event, they did not participate in any conspiracy, if one existed. The essential elements of a conspiracy are (1) an agreement between two or more persons to commit an unlawful act; (2) intentional participation in the conspiracy by the defendant; and (3) an overt act by one of the conspirators. *United States v. Mealy,* 851 F.2d 890, 896 (7th Cir.1988). As indicated, the appellants and their alleged co-conspirators, by their own admission, engaged in third-party processing for a number of years. Thus, there was an "overt act." The remaining questions are whether Brown and Clague agreed to commit an unlawful act and whether they intentionally participated in the alleged conspiracy.

### A. *Agreement to Commit Unlawful Act*

■ The government alleges that the appellants' conduct amounted to bank fraud and money laundering. Bank fraud is proscribed under 18 U.S.C. § 1344.[1] It is also one of the predicate offenses specified under the money laundering statute, which prohibits the use in certain financial transactions of the proceeds of certain predicate offenses affecting interstate or foreign commerce. 18 U.S.C. § 1956.[2] Thus, if we conclude that a rational jury could, based on the evidence presented, find that Brown and Clague were guilty of bank fraud, we may also conclude that the jury could reasonably find the appellants guilty of money laundering. Their guilt would also turn on whether they participated in a type of financial transaction that is covered by § 1956(c).[3] The parties do not dis-

---

1. Section 1344 proscribes any scheme to defraud or obtain money or property from a financial institution by means of false and fraudulent pretenses, representations or promises. 18 U.S.C. § 1344.

2. Section 1956 provides, in pertinent part, that the proceeds of "specified unlawful activities" may not knowingly be used in a financial transaction with intent to promote specified unlawful activities *or* with knowledge that the transaction

is designed, in whole or in part, to conceal or disguise the nature, source, or control of the proceeds of specified unlawful activities. 18 U.S.C. § 1956(a)(1) (emphasis added).

3. We recognize that the term "money laundering" generally refers to situations where the proceeds laundered derive from crimes committed against parties other than the institutions or persons actually laundering the money. Section 1956, however, defines money laundering less

pute that the appellants' activities constitute "financial transactions" within the meaning of § 1956 and, in any event, we find that that section applies.[4]

Section 1344 is to be construed broadly. "Whether a scheme to defraud exists is determined by examining 'whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community. The bank fraud statute condemns schemes designed to deceive in order to obtain something of value.'" *United States v. Hammen*, 977 F.2d 379, 383 (7th Cir.1992) (citing *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir.1987)). This broad definition suggests that each individual component of the scheme need not be specifically illegal, so long as the scheme as a whole constitutes fraudulent conduct. *See Goldblatt*, 813 F.2d at 624 (citing *United States v. Feldman*, 711 F.2d 758, 764 (7th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983)).

■ There is ample support in the record for the jury's conclusion that Brown and

Clague agreed to defraud the banks. There is evidence that they knew that banks would not allow third-party processing because of its potential for increased risk. In addition, the defendants encouraged the recruitment of new merchants, they did not reveal their own activities to the banks and they encouraged other alleged participants not to reveal their activities to the banks. In short, neither appellant's role was limited merely to buying or selling third-party processing services without accompanying fraudulent purposes. *See United States v. Mancillas*, 580 F.2d 1301, 1307 (7th Cir.), *cert. denied*, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). While the appellants argue that they did not know that their activities were illegal and that they consulted attorneys, Brown Br. at 8–10, their purported intent only to "bypass" Visa and Mastercard regulations indicates a departure from notions of fundamental honesty and forthright dealings as required under *Hammen*.[5] Given the wealth of evidence against the appellants, it was perfectly reasonable for the jury to find that Brown and Clague had agreed to defraud the bank.

---

restrictively. Indeed, the statute extends to cases where the defendant conducts or attempts to conduct a transaction involving the proceeds of specified unlawful activity with the intent (merely) to promote the carrying on of such activity. *See* 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(3)(A). Thus, since the indictment was not limited to those provisions of the statute corresponding to "money laundering" as it is commonly understood, we find nothing that prohibits the government from relying on bank fraud as a predicate offense. Further, the appellants had the requisite intent to promote specified unlawful activity, since the jury could reasonably infer that they intended to use the proceeds of the alleged scheme to support their ongoing telemarketing operations, thereby generating more charges that the banks would unwittingly process via the merchant accounts.

4. Under § 1956(c),

    (3) the term "transaction" includes ... with respect to a financial institution ... any ... payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected;

    (4) the term "financial transaction" means (A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments ... or (B) a transaction

involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree....

18 U.S.C. § 1956(c)(3), (c)(4). Banks which process credit card charges, presumably from consumers in many states, clearly affect interstate commerce. Moreover, third-party processing involves "payment, transfer, or delivery by, through, or to a financial institution." Thus, we find that the appellants' third-party processing activities qualify as "financial transactions" under § 1956.

5. We distinguish this case from the one reviewed by the Supreme Court in *Ratzlaf v. United States*, —— U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). In that case, the Court held that, to establish that the defendant "willfully violated" a statute (which prohibits structuring financial transactions to avoid currency reporting requirements), the government needed to prove that the defendant acted with knowledge that his conduct was unlawful. Here, however, the applicable statutes do not require willfulness, *see* 18 U.S.C. §§ 371, 1344 & 1956, and nothing in *Ratzlaf* appears to compel us to consider whether the appellants knew that their actions were illegal. *Cf. Ratzlaf*, —— U.S. at ——, 114 S.Ct. at 663 ("We do not dishonor the venerable principle that ignorance of the law generally is no defense to a criminal charge.").

Further, the appellants' substantive bank fraud and money laundering convictions were not erroneous.

### B. *Participation*

■ The defendants also allege that the government did not offer sufficient evidence that they participated in any conspiracy that may have existed. In particular, they contend that any conspiracy to defraud or to launder money transpired between Carlton and the banks only and that the evidence did not show that Brown and Clague "solicited" or "participated in" making misrepresentations to the banks. Reply Br. at 4; Brown Br. at 12. To prove that a defendant was involved in a conspiracy, the government must show both that he knew of the conspiracy and that he intended to join its criminal purpose. *United States v. Badger*, 983 F.2d 1443, 1449 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2391, 124 L.Ed.2d 293 (1993). " 'While the parties to the agreement must know that others are participating in the conspiracy, they neither have to personally know the individuals involved nor do they have to participate in every facet of the conspiracy scheme.' " *United States v. Auerbach*, 913 F.2d 407, 415 (7th Cir.1990) (quoting *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir.), *cert. denied*, 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985)).

■ The appellants' activities were closely intertwined with those of their alleged coconspirators. As indicated, there is evidence that Brown and Clague discouraged merchants from revealing their third-party processing activities. But even if such evidence had not been available, a rational jury could easily have inferred that Brown and Clague recognized and attempted to join the alleged scheme's criminal purpose. In contrast to the "wheel and hub" arrangement that appellants assert characterized their relationship with Carlton, there is ample evidence that Brown and Clague were, as part of the same scheme, directly involved both in exchanging with the banks credit charges for cash and in promoting such exchanges. It was therefore reasonable for the jury to find that the appellants knew of the alleged conspiracy and intended to join its criminal purpose. The appellants' conspiracy convictions, like their underlying bank fraud and money laundering convictions, may not be set aside for insufficient evidence.[6]

### III.

■ Brown and Clague also raise a variety of challenges to the district court's evidentiary and sentencing decisions. We review the district court's evidentiary rulings only for abuse of discretion. *United States v. Smith*, 995 F.2d 662, 671 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 718, 126 L.Ed.2d 683 (1994).

### A. *Admission of Testimony*

■ Brown and Clague argue that the trial court erred in admitting the testimony of Carlton regarding two merchant account holders and one telemarketer that he allegedly recruited. They contend that this testimony was inadmissible hearsay. Brown and Clague properly objected to the testimony at

---

**6.** Brown and Clague also argue that they lacked the knowledge, required under § 1956, that their activities were unlawful. *See* 18 U.S.C. § 1956(a)(1). They claim that they themselves did not lie to banks and that they "could rightfully assume" that any merchants who were processing their credit card charges were not deceiving their banks or otherwise acting illegally. Reply Br. at 7. As indicated below, however, there is ample evidence that Brown and Clague knew from experience that banks generally did not want to process telemarketing charges and that banks closed merchant accounts that they believed were engaged in third-party processing. Further, a postal inspector testified that he *told* the appellants that their activities were illegal. Therefore, the jury could reasonably infer that

the appellants knew that their efforts to link telemarketers and merchant accounts and to thereby carry on third-party processing were illegal.

Likewise, the appellants argue that they lacked the specific intent required under § 1956 since, they contend, their knowing efforts to conceal the telemarketing charge transactions from the banks did not have "the purpose of causing some financial loss to another or bringing about some financial gain" to themselves. Brown Br. at 14. We find this argument unpersuasive. Brown and Clague were aware that the banks would process the charges only at higher fees, if at all. Their success in avoiding such higher fees amounted to financial loss to the banks and financial gain to themselves.

trial, but the trial court allowed it in after assurances that the government would show that the three persons about whom Carlton testified were unindicted co-conspirators. When the government failed to make this showing, however, the trial court let the testimony stand, determining that the testimony was "other bad acts" evidence under Fed. R.Evid. 404(b). The court allowed the testimony for the limited purpose of showing the appellants' knowledge and intent and instructed the jury accordingly. Tr. 452–58, 462.

In our view, Carlton's testimony as to the three individuals' statements was, in fact, hearsay. Each of the individual's statements detailed how he wanted and intended to help, and how he had in fact helped further the alleged third-party processing scheme. Carlton Tr. 12, 30, 36, 37, 54, 55, 59. Brown and Clague also correctly point out that the hearsay "exception" for statements of co-conspirators, *see* Fed.R.Evid. 801(d)(2)(E),[7] requires a predicate showing that a conspiracy exists. *Durrive*, 902 F.2d at 1225–30. By raising its Rule 404(b) argument well into the trial, the government conceded—and the trial court apparently agreed—that no such showing of conspiracy was made. And our review of the transcript reveals nothing to the contrary. Thus, it was error for the district court to allow the testimony, even with the limiting instruction.[8]

At the same time, we believe that the trial court's error was harmless. Carlton himself was involved with incorporating the three individuals into the scheme and, interspersed with the challenged hearsay, he made numerous comments that directly related his own experiences in working with them. The postal inspector also testified about Clague's interaction with at least one of the three individuals. Thus, in our view, the hearsay attributed to the three individuals was merely cumulative. In any event, in light of the weight of the remaining evidence of the alleged scheme,[9] we find that the appellants were not prejudiced by the court's error. *See* Fed.R.Crim.P. 52(a); *United States v. Montoya*, 827 F.2d 143, 154 (7th Cir.1987).

Brown and Clague also contend the trial court erred in admitting the testimony of a bank officer. The officer produced exhibits relating to an agreement between her bank (which was not mentioned in the indictment) and the first merchant found by Carlton, and discussed the bank's policies regarding telemarketing accounts and third-party processing. Tr. 20–22. She also described when the account associated with Carlton was opened and the amount that passed through it. The government seems to have argued variously that the officer's testimony was nonhearsay evidence and that it was Rule 404(b) evidence. Tr. 25–26. Defense counsel objected to the testimony, arguing that the testimony was hearsay and that it also did not satisfy Rule 404(b). Tr. 24, 34. The trial court ultimately allowed the testimony in under Rule 404(b), instructing the jury to use it only as evidence of knowledge and intent. Tr. 34–36, 44.

█ The trial court's ruling on the officer's testimony was not error. First, the officer never testified as to the out-of-court statements of another person, and so there

---

7. To be precise, Fed.R.Evid. 801(d)(2) defines statements by co-conspirators as admissible nonhearsay, not as an "exception" to the hearsay rule.

8. *The court stated that it would allow the testimony* "for what light it may shed, if any, with regard to the defendants' knowledge and intent and should be considered ... only for that limited purpose." Tr. 462. We question why the court allowed the testimony, only to offer a limiting instruction that virtually guaranteed that the jury would not rely on it. *Since the challenged* statements were not made to the appellants, there is no logical connection between the statements and the appellants' knowledge and intent. Further, we question why the district court even entertained the government's Rule 404(b) argument, since even "other acts" evidence is inadmissible if it is also hearsay. Nevertheless, as we explain below, any error occasioned by the district court's unorthodox approach was, given the cumulative nature of the challenged testimony, harmless.

9. In particular, since one of the three declarants was a telemarketer, the appellants' challenge here affects only two of the six merchant accounts (found by Carlton) about which the government presented evidence.

was no hearsay.[10] Second, trial courts may admit evidence of prior or subsequent bad acts if: (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other acts are similar enough and close enough in time to be relevant; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. Fed.R.Evid. 403, 404(b); *United States v. Scop,* 940 F.2d 1004, 1009 (7th Cir.1991). While the officer could not document that her bank had disbursed any money to the appellants, Tr. 29, other testimony indicated that her bank had unwittingly processed charges for both Brown and Clague. Carlton Tr. 17–21. Further, the events underlying the officer's testimony ended only a few months before those involving one of the banks actually mentioned in the indictment. The purported fraud occurred as the government alleges in the indictment: Carlton found a merchant account, Brown and Clague processed telemarketing charges through it and the bank eventually froze the account after suspecting third-party processing. Thus, this was at least circumstantial evidence to support an inference that Brown and Clague had defrauded the officer's bank. Further, this evidence had value as showing the defendants' continuing scheme as well as their knowledge. In any event—and more convincingly—we think that the strength of the other evidence indicating that the appellants participated in a scheme to defraud banks is impressive. We do not therefore believe that Brown and Clague were prejudiced by the officer's testimony, especially given the trial court's limiting instruction.

**10.** The officer did state, however, that one of the merchant account holders recruited by Carlton *had never informed* the bank that she intended to do third-party processing for telemarketers. Tr. 24. Of course, the account holder's failure to make a statement cannot be hearsay.

**11.** In particular, Brown interacted with the inspector (who posed as a merchant) in much the same way as he interacted with Carlton. Brown solicited the inspector through an advertisement seeking merchant accounts, used a false name in

▉ Brown makes an additional challenge to certain testimony by the postal inspector. Brown claims that the trial court allowed the government to present evidence of Brown's conviction, in Texas, of similar charges. This argument is without merit. After objection by Brown's counsel, as well as after lengthy discussion, the trial court ruled that, while the pending charges could not be mentioned, the government could bring out that the inspector had informed Brown and Clague that their conduct was illegal. This evidence was needed to prove knowledge and intent with respect to the money laundering charge. Tr. 225–32. The inspector did testify that he had given the appellants written notice that their activities were illegal, but he did not mention an indictment with respect to either Brown or Clague. Tr. 331.

Brown also argues that the district court erred in allowing the postal inspector to testify as to aspects of his undercover investigation in Texas, in particular, two audio tapes and a case summary of the investigation. This ruling was also not erroneous. The court apparently admitted the challenged evidence under Rule 404(b), and we agree that the requirements for application of that rule were satisfied here.[11]

### B. *Sentencing*

▉ With respect to sentencing, Brown and Clague claim that the district court erred in applying a four-level increase pursuant to U.S.S.G. § 3B1.1(a). Brown further claims that the court erred in assessing his relevant conduct and that increasing his sentence pursuant to U.S.S.G. §§ 2S1.1(b)(2)(A), 3B1.1(a) violated the double jeopardy clause.

Guidelines § 3B1.1(a) states: "If the defendant was an organizer or leader of a

discussing third-party processing, asked the inspector to open a merchant account and discouraged him from telling the bank exactly what he was doing. Tr. 236–79. In light of the taped conversations with Brown, the inspector's testimony was apparently germane to show a pattern of conduct involving similar bank fraud in Texas. This testimony's probative value outweighed any risk of unfair prejudice it posed. *See Scop,* 940 F.2d at 1009.

criminal activity that involved five or more participants *or was otherwise extensive,* increase by four levels." U.S.S.G. § 3B1.1(a) (emphasis added). Under the "otherwise extensive" prong of § 3B1.1(a), no prescribed number of criminally responsible "participants" is required. U.S.S.G. § 3B1.1(a), comment (n. 2); *United States v. Miller,* 962 F.2d 739, 745 (7th Cir.1992). Here, while the district court apparently considered both prongs of § 3B1.1(a), it based the four-level increase on the "otherwise extensive" prong. Sentencing Tr. 61–62.[12] This was not error. There is ample evidence that the appellants brought together several telemarketers who solicited sales from hundreds of consumers, the telemarketers charged these sales over the telephone, and received credit for these charges from unwitting banks, using the services of intermediaries and merchant account holders who were either recruited or advised by at least one of the appellants. The record indicates that Brown recruited the scheme's central figure, Carlton, instructed Carlton about third-party processing and told him to locate merchant accounts. The record also indicates that Clague encouraged Carlton to find accounts and that Clague approved new merchant recruits whose real or purported businesses appeared to generate charges of a volume and value to make it more difficult for banks to detect the third-party processing. Thus, it was not unreasonable for the district court, which heard the evidence in the case, to find that Brown and Clague were "organizers" or "leaders" of an "otherwise extensive" criminal activity.[13]

▬ Brown's relevant conduct challenge is based primarily on his claim that he was, in effect, expelled from the conspiracy as of April 19, 1991, and that any later disbursements to him from the merchant accounts resulted from a different conspiracy.[14] In analyzing this claim, we note the commentary to U.S.S.G. § 1B1.3 (Nov. 1991), which states that, "in the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, [relevant conduct for sentencing purposes] also includes conduct of others in furtherance of the execution of the jointly undertaken criminal activity that was reasonably foreseeable by the defendant." U.S.S.G. § 1B1.3, comment. The court may rely upon any information in passing sentence that it believes has sufficient indicia of reliability. *United States v. Miller,* 891 F.2d 1265, 1270 (7th Cir.1989).

Brown's sentencing hearing included testimony by a government agent that Brown had accepted wire transfers from three of the merchant accounts generated by Carlton. Brown accepts accountability only for those transfers between March 11, 1991 and April 19, 1991. The district court agreed with Brown with respect to the initial date of the relevant transfers, since Carlton and the first merchant he recruited did some third-party processing before Brown began to contribute telemarketing charges. Sentencing Tr. 35, 49. But the court rejected Brown's claims

---

**12.** At the sentencing hearing the following interchange occurred:

> THE COURT: But weren't there literally hundreds of people that were solicited throughout the country by telephone for the sale of this merchandise? Isn't that true or is it not?
> [PROSECUTION]: That's correct, Your Honor.
> [DEFENSE COUNSEL]: It is the truth, but I'm not sure how the Court is considering it.
> THE COURT: Considering it as extensive. That [Clague's] involvement, along with Mr. Brown, was extensive. I don't know how you would define it otherwise.
> [DEFENSE COUNSEL]: I agree....
> Sentencing Tr. 61–62.

**13.** Note that the court would not have erred even if it had applied the "five or more participants" prong of § 3B1.1(a), since the alleged scheme involved many people in addition to the several known or recruited by Brown and Clague. U.S.S.G. § 3B1.1(a); U.S.S.G. § 1B1.3, comment (relevant conduct for sentencing where crime committed in concert with others includes all reasonably foreseeable conduct, whether or not charged).

**14.** Specifically, Brown contends that Carlton and the third merchant found by Carlton had "frozen him out" of third-party processing. Brown Br. at 31. He claims that he had no knowledge of any other participant's conduct from the time that he was frozen out until the third merchant's account was closed in May 1991. He therefore contends that such conduct was not "foreseeable" and thus not relevant for sentencing. *See generally United States v. Edwards,* 945 F.2d 1387, 1394–96 (7th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992).

that he was frozen out. Sentencing Tr. 33. After the alleged freezing out, Brown received wire transfers from one of Carlton's merchant recruits. Further, there is testimony that, at a later point, Brown told other participants that he would not cut Carlton out of the scheme, that Carlton lost a portion of his share to Brown and that Carlton told one of the merchants that she would need to explain to the bank the "roles" played by Brown and Clague in her business. Yale Tr. 26–33; Carlton Tr. 48; Tr. 111, 120–21, 166. This evidence suggests that Brown remained an active and influential leader and beneficiary of the scheme he apparently initiated by recruiting Carlton. Thus, the district court did not err in finding that Brown's conduct was relevant even after the point when he was allegedly "frozen out." [15]

Finally, Brown contends that the district court violated the double jeopardy clause in sentencing him. Brown had been sentenced by a district court in Texas for conspiracy to commit wire fraud and bank fraud and for aiding and abetting similar conduct. Def.'s Ex. 5. That court based its sentence, in part, on U.S.S.G. § 2F1.1(a) [bank fraud] and on U.S.S.G. § 3B1.1(a) [leadership role]. The Texas court applied these provisions to (1) a $350,000 loss allegedly caused by Brown and his co-conspirators in Illinois and (2) two of the participants in the Illinois scheme. Def.'s Ex. 5 at 10. In the instant case, Brown received a three-level increase under U.S.S.G. § 2S1.1(b)(2)(A) [money laundering] and a four-level increase under § 3B1.1(a). He contends that the increases in this case violate double jeopardy because the Texas court had already relied on some of the same facts (namely, the $350,000 loss and the two common participants).[16]

We reject Brown's contention. First, § 3B1.1 takes into account only the number of participants (not the amount involved), so there could not have been any double jeopardy violation with respect to § 3B1.1 and the $350,000 loss. Further, we find that there was no double jeopardy violation with respect to § 3B1.1 and the two common participants. The Supreme Court has long interpreted the Double Jeopardy Clause as protecting against multiple punishments. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076–77, 23 L.Ed.2d 656 (1969), *overruled on other grounds*, 490 U.S. 794, 802–03, 109 S.Ct. 2201, 2206–07, 104 L.Ed.2d 865 (1989). But it would appear that neither the Supreme Court nor this court has yet squarely decided whether the Double Jeopardy Clause bars further prosecution or sentencing for conduct that has been the basis of a sentencing enhancement under the Guidelines in an earlier case. The Fifth Circuit has, however, reached this question and determined that Double Jeopardy bars the second prosecution only if it involves the same offense. *United States v. Cruce*, 21 F.3d 70, 74–75 (5th Cir.1994). In *Cruce*, the defendants had moved to dismiss on double jeopardy grounds an indictment for bank fraud conspiracy because they had been convicted and sentenced in another jurisdiction for committing bank fraud conspiracy against the same bank. The defendants contended that the later prosecution was barred because the conduct upon which the second prosecution was based had been considered in the first case as relevant conduct under the Sentencing Guidelines. The Fifth Circuit rejected this argument, finding that—in light of such factors as time, participants, location, actions taken and statutes involved—the later prosecution involved an of-

---

15. Brown apparently does not contest the district court's *legal* analysis with regard to sentencing. In any event, we find that the district court correctly grouped the conviction counts together and used the table for money laundering offenses, since that table resulted in the highest offense level. *See* U.S.S.G. §§ 3D1.2(d), 2S1.1(c).

16. In actual fact, the record is unclear whether the court below considered the same two participants that the Texas district court considered in enhancing Brown's sentence in the Texas pro-

ceeding. As indicated, the court below relied on the "otherwise extensive" prong of § 3B1.1. The Texas court, on the other hand, relied on the "five or more participants prong." Unfortunately, however, the Texas court did not specify which two individuals in Illinois it considered in enhancing Brown's offense level pursuant to § 3B1.1(a), raising the possibility that the court below actually considered the same two individuals in finding the alleged scheme "otherwise extensive."

fense distinct from the first offense. *Id.* at 75.[17]

The *Cruce* court based its reasoning on *United States v. Dixon,* —— U.S. ——, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993), in which the Supreme Court made clear that the Double Jeopardy Clause precludes a second punishment for the same *offense,* not a second punishment for the same *conduct. Id.* at ——, 113 S.Ct. at 2860. *Dixon* expressly overruled *Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), which had prohibited "a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government will prove *conduct* that constitutes an offense for which the defendant has already been prosecuted." *Id.* at 510, 110 S.Ct. at 2087 (emphasis added).[18] In addition, the *Cruce* court determined that the Guidelines evinced no contrary congressional intent; rather, the Guidelines were intended to preserve the trial judge's wide freedom to consider aggravating and mitigating circumstances in sentencing. *Cruce,* 21 F.3d at 76–77.

We think that the reasoning in *Cruce* applies with equal weight in this case. Even before *Dixon,* we had noted the distinction, in the context of double jeopardy, between multiple punishments for the same *conduct* (which are not barred) and multiple punishments for the same *offense.* For example, in *United States v. Troxell,* 887 F.2d 830 (7th Cir.1989), we affirmed the district court's rejection of a double jeopardy challenge to a bail-jumping conviction and sentence where the underlying conduct had already been considered in sentencing for an earlier co-

caine distribution conviction. Similarly, in *United States v. Brown,* 785 F.2d 587 (7th Cir.1986), we affirmed a bail-jumping sentence despite the fact that the judge in an earlier case had considered the same underlying conduct in sentencing the same defendant for mail fraud. *See also United States v. Haygood,* 502 F.2d 166 (7th Cir.1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 791, 42 L.Ed.2d 812 (1975) (consideration of prior convictions at time of sentencing not equivalent to multiple punishment for earlier offense). We also have recognized the importance of allowing trial judges to draw upon a wealth of information in setting an appropriate sentence. *Troxell,* 887 F.2d at 835. Further, we note that the *Cruce* approach is in accord with the decisions of other courts of appeals, which generally have rejected double jeopardy challenges to sentence enhancement, whether based on the Guidelines or on a statute. *United States v. Mack,* 938 F.2d 678, 681 (6th Cir.1991) (imposition of enhanced sentence under Guidelines for other criminal activity not barred because enhanced punishment did not constitute subsequent punishment for double jeopardy purposes); *United States v. Thomas,* 895 F.2d 1198, 1201 (8th Cir.1990) (imposition of enhanced sentence under Guidelines not barred because not second punishment for earlier crime but more severe punishment for later crime); *United States v. Wright,* 891 F.2d 209, 212 (9th Cir.1989) (imposition of enhanced sentence under Guidelines not barred because sentence did not exceed punishment intended by legislature); *see also United States v. Mocciola,* 891 F.2d 13, 17 (1st Cir. 1989) (imposition of statutorily enhanced sen-

---

**17.** The Fifth Circuit noted that the conspiracy resulting in the prior conviction took place over a time period that included the time period of the latter alleged conspiracy, that the two conspiracies allegedly occurred at the same bank facilities and that both indictments alleged bank fraud. Nevertheless, the court concluded that the offenses involved in the two proceedings were factually distinct because there was no overlap in the overt acts set out in the two indictments, because the later indictment involved an additional co-conspirator and because the later indictment charged three offenses unalleged in the earlier indictment. *Cruce,* 21 F.3d at 75–76.

**18.** In this, *Grady* added a second, "same conduct" requirement to the familiar "same ele-

ments" test of *Blockburger* for determining whether offenses are separate for double jeopardy purposes. *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *United States v. McKinney,* 919 F.2d 405, 416–17 (7th Cir.1990), *criticized on other grounds, United States v. Spears,* 965 F.2d 262 (7th Cir.1992). In *Blockburger,* the Court stated: "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. at 304, 52 S.Ct. at 182 (emphasis added).

tence based on conduct tried in an earlier proceeding not barred because enhancement not second punishment for double jeopardy purposes); *United States v. Rodriguez–Gonzalez*, 899 F.2d 177, 180–81 (2d Cir.) (same), *cert. denied*, 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990); *United States v. Williams*, 892 F.2d 296, 304–05 (3d Cir.1989) (same), *cert. denied*, 496 U.S. 939, 110 S.Ct. 3221, 110 L.Ed.2d 668 (1990); *United States v. Bigelow*, 897 F.2d 160, 161–62 (5th Cir. 1990) (same).[19]

Here, Brown does not argue that his conviction below is for the same offense for which he was sentenced in Texas. Indeed, while the convictions in both jurisdictions involved third-party processing, it appears that the banks and other participants in the two alleged schemes are distinct, with the exception of Brown himself. Thus, the offenses were not the same and the court below did not violate double jeopardy in applying § 3B1.1 to the two Illinois participants already considered by the Texas district court. To conclude otherwise would restrict the sentencing judge's ability to consider a defendant's entire background—whether that background militates in favor of a more severe sentence or a lesser one.

 Second, § 2S1.1 takes into account only the amount involved (not the number of participants), so there could not have been a double jeopardy violation with respect to § 2S1.1 and the two common participants. Further, § 2S1.1 applies to a different type of offense conduct than does § 2F1.1 and thus the enhancement under the former provision was not subject to the double jeopardy bar. *United States v. Jackson*, 983 F.2d 757, 769 (7th Cir.1993).[20] Consequently, the district court below could legitimately consider the $350,000 loss in applying § 2S1.1, even though the Texas court considered the same loss in applying § 2F1.1.

## IV.

For the above reasons, the judgment of the district court is AFFIRMED.

**19.** In the face of this wealth of contrary authority, Brown relies on *United States v. Koonce*, 945 F.2d 1145 (10th Cir.1991), and *United States v. McCormick*, 992 F.2d 437 (2d Cir.1993), both of which barred subsequent prosecution and punishment of conduct on which an earlier court had relied in enhancing the defendants' sentences. As indicated, however, the Supreme Court rejected this "same conduct" test for double jeopardy in *Dixon*, —— U.S. at ——, 113 S.Ct. at 2860.

**20.** In *Jackson*, we held that the "same elements" test of *Blockburger* is one of statutory construction and does not control when the legislative intent is clear from the relevant statutes or legislative history. Here, it is clear that Congress, in enacting U.S.S.G. § 2S1.1 and U.S.S.G. § 2F1.1, meant to provide sentence enhancements for two different types of offense conduct. Section 2S1.1 (relied upon by the Illinois court) applies only to money laundering, whereas Section 2F1.1 (relied upon by the Texas court) applies only to bank fraud. As defined under 18 U.S.C. § 1956 and 18 U.S.C. § 1344, money laundering and bank fraud do not satisfy *Blockburger's* requirement that, to be deemed separate offenses for double jeopardy purposes, each offense require proof of a fact which the other does not (since bank fraud is used here as a predicate offense to money laundering). However, the language of §§ 1344 and 1956 indicates that Congress contemplated different types of offense conduct in enacting the two provisions. Section 1344 punishes parties for obtaining money from banks through fraud, whereas § 1956 punishes parties for engaging in transactions involving the proceeds of specified unlawful activities—whether or not bank fraud—where the transactions are designed to "launder" these proceeds, avoid certain reporting requirements or promote further specified unlawful activities. *Compare* 18 U.S.C. § 1344 *with* 18 U.S.C. § 1956(a)(1). *See also Jackson*, 983 F.2d at 769. In any event, as this discussion suggests, the Texas enhancement under § 2F1.1 and the Illinois enhancement under § 2S1.1 involved different *offenses* (as measured by such factors as time and participants) even if they involved the same *conduct*. As such, the later Illinois enhancement did not violate double jeopardy.