UNITED STATES of America, Plaintiff–Appellee,

v.

Robert A. LEWIS, Michael Holmes, Eston Thomas a/k/a "Poptite", and Timothy W. Glispie, Defendants–Appellants.

Nos. 96–1151 to 96–1154.

United States Court of Appeals, Seventh Circuit.

Argued May 20, 1997.

Decided June 26, 1997.

---

Thomas Edward Leggans, Office of the United States Attorney, Criminal Division, Fairview Heights, IL, for Plaintiff–Appellee.

Edward Witt Chandler (argued), Memphis, TN, for Defendant–Appellant Robert A. Lewis.

John A. Hudspeth, Jr. (argued), Carlyle, IL, for Defendant–Appellant Michael Holmes.

John Dale Stobbs, II (argued), East Alton, IL, for Defendant–Appellant Easton Thomas.

Burton H. Shostak (argued), Moline & Shostak, St. Louis, MO, for Defendant–Appellant Timothy W. Glispie.

Before CUMMINGS, FLAUM, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Four gentlemen from Carbondale, Illinois, were convicted by a jury of conspiracy to distribute crack cocaine. Each was also convicted on at least one count of distributing crack, and two were found guilty of money laundering as well. All four appeal, raising a host of challenges to their convictions and sentences.

Buford Lewis, the brother of defendant Robert Lewis, was a big time crack dealer in Carbondale. Buford's primary supplier was his cousin, Terry ("Mutt") Jones, who operated out of Mississippi. In late 1992, Buford— who, by the way, was a star witness for the prosecution—began dealing with Eston Thomas (we'll call him Eston so he's not mixed up with Michael Thomas, a defendant in the case on AWOL status), also a Carbondale crack dealer. Buford and Eston had been put in touch with each other by Timothy Glispie, one of Eston's underlings. Shortly after Buford and Eston began working together they took a little trip to Hayti, Missouri, to meet Jones. Glispie and one of Buford's employees, Michael Holmes, came along for the ride. Once in Hayti, Buford acted as a go-between for Jones and Eston. Eston gave Buford $10,000 to pass to Jones, and Jones handed over 13 ounces of cocaine base to Eston.

In the summer of 1993, Buford once again brokered a drug deal between Jones and Eston. At a meeting at Jones' girlfriend's house in Carbondale, Buford told Jones that Eston was looking to buy more drugs. So advised, Jones got on the job and cooked up approximately 6 ounces of crack for Eston.

In addition to arranging deals, Buford purchased large quantities of drugs for resale. For example, Buford and Holmes picked up 18 ounces of crack from Jones at his trailer in Mississippi. Within a week, Jones also met Buford and Holmes in Memphis and sold them a kilo of powder cocaine. A few days later, Jones arrived in Carbondale to cook the powder cocaine into crack. Although Eston was not a direct player in these deals, Buford sold him half of both shipments.

Buford also sold crack to his brother Robert. Like most brothers, Buford and Robert helped one another out. For example, Buford hooked Robert up with a supplier named Harrington and later put him in touch with Jones. Robert ended up buying 100 ounces of powder cocaine from Jones, which he converted into crack and resold. Occasionally, Jones would give Buford extra dope to pass on to Robert. Likewise, when Buford found himself running low, Robert would (at Jones' direction) lend Buford crack.

On June 7, 1994, a grand jury returned a series of indictments against Carbondale's drug dealers. Included in the indictments were Buford and Robert Lewis, Eston Thom-

as, Michael Holmes, Timothy Glispie, Michael Thomas, and a bunch of others. In September 1994, the grand jury returned a superseding indictment alleging a single conspiracy. That same month, Buford Lewis pled guilty to six counts of distributing crack. On January 4, 1995, a second superseding indictment was returned. It contained the following nine counts:

Count 1 charged Robert Lewis, Holmes, Eston, Glispie, and Michael Thomas with conspiracy to distribute cocaine and cocaine base.

Count 2 charged Lewis with distributing crack.

Count 3 charged Lewis with money laundering.

Count 4 charged Holmes with distributing crack.

Count 5 charged Eston with distributing crack.

Count 6 charged Michael Thomas with distributing crack.

Counts 7 & 8 charged Eston with money laundering.

Count 9 charged Glispie with distributing crack.

After the jury spoke (it said guilty on all charges), Robert Lewis was sentenced to 292 months in prison. Holmes and Eston each received 360 months and Glispie was sent away for 240 months. We now consider their appeals.

■ The defendants, who are black, argue in their joint brief that the trial court erred in finding that the prosecution's peremptory challenges did not violate *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). We apply a three-step process when analyzing *Batson* claims. First, the defendant must make a prima facie showing that the prosecutor used a strike on the basis of race. Second, the prosecutor must then provide a race-neutral reason for the strike. Finally, the defendant must prove the proffered reason was really a fraud meant to cover up purposeful discrimination. *Id.* at 96–98, 106 S.Ct. at 1722–24.

■ In this case, the prosecution used peremptory strikes against two of the three black members of the jury pool. The third made it onto the panel that heard the case. Presuming a prima facie showing under *Batson*, the prosecution explained that the excluded jurors were unemployed and one had two relatives currently in prison for dealing drugs. Both explanations are race-neutral and appear valid. *See United States v. Hunter*, 86 F.3d 679, 683 (7th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 443, 136 L.Ed.2d 339 (1996) (unemployed status deemed valid, race-neutral reason); *United States v. Hughes*, 970 F.2d 227, 230–31 (7th Cir.1992) (unemployed status and fact that juror's cousin had served time for a drug offense considered race-neutral reasons). And now, rather than trying to show pretext, the defense merely claims, "The unemployed have rights as a class or group. Long hair, tattoos, or obesity may be legitimate excuses, but not unemployed." This contention is quite less than meritless.

The defendants next challenge the district judge's decision to admit two of Robert Lewis' statements into evidence. On May 20, 1994, Lewis talked to an IRS agent and an Illinois state trooper, expressing his willingness to cooperate. On June 9, two days after he was secretly indicted, Lewis and his attorney talked again, this time only to the IRS agent. The government sought to introduce portions of these statements, and the defense objected. The judge admitted the statements but ordered references to Lewis' coconspirators, as required by *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), deleted. The judge also gave a proper limiting instruction on the use of the statements.

■ The defendants challenge the district court's ruling on four grounds. First, they claim the statements were inadmissible under Federal Rule of Evidence 410(4) and Federal Rule of Criminal Procedure 11(e)(6) because they were made during plea negotiations. Second, the defendants contend the statements were made involuntarily. Third, they assert that the attorney who accompanied Lewis on June 9 was ineffective. Fourth, they argue the statements were inadmissible hearsay because they were not made in furtherance of the conspiracy.

None of these arguments are persuasive. First, Rule 410(4) and Rule 11(e)(6) only apply to statements made to government attorneys. They do not cover those made to law enforcement agents. *United States v. Springs*, 17 F.3d 192, 195 (7th Cir.1994) (interpreting Fed.R.Crim.P. 11(e)(6)); *United States v. Aponte–Suarez*, 905 F.2d 483, 493 (1st Cir.1990) (interpreting Fed.R.Evid. 410(4)). Second, the district court thought the defendants' claim that the statements were involuntary was raised too late. This was certainly understandable because the defendants never filed a motion to suppress before trial and did not even object to the admissibility of the statements until late in the government's case. While that seems like a legitimate reason not to address the issue, the argument also goes nowhere on the merits. Lewis was not under arrest at either meeting when statements were made, he signed a *Miranda* waiver at the initial discussion, and he was accompanied by an attorney at the second chat. Third, even if we saw fit to address Lewis' ineffective assistance claim on this direct appeal, he could not meet either prong of the now-often-cited *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) test. For example, it seems reasonable for the attorney to have allowed Lewis to speak to the IRS agents in order to lay the groundwork for a sentencing reduction for acceptance of responsibility or a departure for substantial assistance. Finally, the statements were not admitted under the coconspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E), so there was no need for the judge to find that they had been made in furtherance of the conspiracy. Rather, the government dropped all references to the conspiracy and Lewis' cohorts and sought to admit the statements solely against Lewis himself. Coupled with the limiting instruction, this was a permissible course for the district judge to take.

■ The defendants also argue that the jury instructions were improper because the court (1) refused their tendered instruction on multiple conspiracies; (2) declined to instruct the jury that a money laundering conviction under 18 U.S.C. § 1956(a)(1)(B)(i) requires a showing of willfulness; and (3) inadequately described the elements of conspiracy.

We have examined the instructions given and they seem fine to us. First, while the judge refused the defense's instruction on multiple conspiracies, he gave a widely accepted pattern instruction on the issue. Second, the government does not have to show that a defendant acted willfully in order to convict him of money laundering under 18 U.S.C. § 1956(a)(1)(B)(i). *United States v. Brown*, 31 F.3d 484, 489 n. 5 (7th Cir.1994) (distinguishing convictions for money laundering under § 1956 from those for structuring financial transactions to avoid currency reporting requirements under 31 U.S.C. § 5324(a)); *United States v. Santos*, 20 F.3d 280, 283 n. 2 (7th Cir.1994) (same). Finally, the general instructions on conspiracy given in this case have been repeatedly upheld.

■ The defendants next claim that the evidence was insufficient to convict them of a single conspiracy. Instead, they claim that three distinct conspiracies existed. Robert Lewis also believes the evidence was insufficient to convict him of distributing crack.

While a jury could have reasonably concluded that the defendants operated independently of each other, the defendants cannot meet their nearly insurmountable burden of showing that no rational juror could have concluded that the single conspiracy charged in the indictment existed. *United States v. Bullis*, 77 F.3d 1553, 1560 (7th Cir.1996). A single source of supply (Jones) fed the three big dealers (Buford Lewis, Robert Lewis, and Eston Thomas). Because (1) Buford Lewis would broker deals between Jones and both Robert Lewis and Eston Thomas, and (2) drugs and money flowed between the allegedly independent drug dealers (Robert would lend Buford dope; Buford sold to Robert and Eston), a jury could rationally conclude that the defendants conspired to divide up the lucrative Carbondale crack market.

■ Lewis' challenge to his distribution conviction also fails. Count 2 charged him with aiding in the sale of 4.2 grams of crack. On January 26, 1993, undercover agents conducted surveillance as an informant purchased drugs from Leonard Bowen, one of

Lewis' pushers. Bowen contacted Lewis in order to get the drugs needed for the deal. Lewis told Bowen he was out of crack but would locate some for him. A few hours later, Bowen met Lewis at a laundromat and told him how much crack he needed. Lewis later delivered that amount to Bowen, who sold it to the informant. Based on a review of this evidence, a rational juror could certainly conclude Lewis knew of Bowen's deal, "participated in it as something he wished to bring about, and sought by his actions to make it succeed." *United States v. Scroggins,* 939 F.2d 416, 421 (7th Cir.1991) (quoting *United States v. Galiffa,* 734 F.2d 306, 311 (7th Cir.1984)).

As one can see, we have not been impressed with the challenges to the convictions discussed so far. And we have only discussed the best challenges. So we will dismiss the other conviction-related claims as meritless and move on to the sentencing issues.

■ Again, as with the challenges to the convictions themselves, the defendants raise a number of sentencing issues. First, they contend the district court committed clear error in basing their sentences on crack instead of powder cocaine. In order to apply the crack guidelines, a judge must find, by a preponderance of the evidence, that the defendants were dealing crack. In this case, the evidence demonstrated that any powder cocaine passing through these dealers' hands was immediately cooked into crack. As a result, we cannot say the district court erred in using the crack guidelines.

■ Next, the defendants claim they were entitled to downward departures based on the disparity in the way the guidelines treat crack and powder cocaine. But we cannot review a district court's refusal to depart from the guidelines unless the defendants point to language suggesting that the court erroneously thought it lacked the authority to act. *United States v. Cureton,* 89 F.3d 469, 474 (7th Cir.1996). The defendants have not shown that Judge Riley was confused about the scope of his authority to depart. We have already held that "[t]he fact that defendants convicted of offenses involving crack cocaine receive enhanced penalties is not a sufficiently 'atypical' or 'unusual' circumstance to warrant a downward departure." *United States v. Arrington,* 73 F.3d 144, 146 (7th Cir.1996). *See also* United States v. Booker, 73 F.3d 706, 710 (7th Cir.1996) ("[D]epartures are intended to be based on atypicalities peculiar to the offender or the particular crime, not class-wide departures based upon the typical offense."). The defendants in this case have not shown that their circumstances are at all different from those of other defendants convicted of conspiracy to distribute crack cocaine. This argument, accordingly, must come up dry.

Finally, the defendants contend the district court erred in calculating drug quantities and by failing to state specific reasons why each defendant was being held responsible for more than 1.5 kilograms of crack. The government counters by noting that each defendant is liable for the foreseeable acts of his coconspirators and that we review the district court's findings for clear error.

■ The defendants are correct that a district court should provide specific "reasons why each individual ... reasonably foresaw the particular amount of drugs for which he will be held accountable, with reference to supportive evidence." *United States v. Goines,* 988 F.2d 750, 775 (7th Cir.1993). However, even when a district court makes "generic" findings, we will affirm unless the defendant puts forth "meritorious arguments for remanding and resentencing." *United States v. James,* 40 F.3d 850, 870 (7th Cir. 1994), *modified,* 79 F.3d 553 (7th Cir.1996). While we think the district judge here should have done a more thorough job of explaining his view (he never even mentioned foreseeability), the defendants simply suggest—without further explanation—that Lewis was responsible for "less than 1.5 kilograms," Holmes for 2.2 grams, Eston Thomas for 226 kilograms of marijuana equivalent units, and Glispie for 482 grams.

■ Because we can, upon review of the record, come up with reasons why each defendant was found to be on the hook for 1.5 kilograms, we can affirm without sending the case back for resentencing. Let's start with Robert Lewis. His PSR states he admitted

purchasing 100 ounces (roughly 2.8 kilograms) of powder from Jones and cooking it into crack. Because these purchases were arranged by Buford, Robert's brother and a key player in the conspiracy, Robert is clearly chargeable with more than 1.5 kilograms of crack.

■ Next is Mr. Holmes, who claims responsibility for only 2.2 grams of crack. That's absurd. Holmes accompanied Buford Lewis, Eston Thomas, and Glispie to Missouri and Mississippi to pick up drugs—in fact, he drove one of the cars—when the conspiracy got rolling. During that transaction, 13 ounces (about 369 grams) of crack changed hands. Holmes later returned to Mississippi to pick up another 18 ounces (510 grams), of which half was sold to Eston for resale. Finally, Holmes accompanied Buford to Memphis to retrieve another kilo of powder, which Jones cooked up and Buford resold to Eston and other coconspirators. Those three deals alone put Holmes at almost 1.9 kilos.

■ The calculations for Glispie and Eston Thomas are more complicated. Glispie put Eston and Buford Lewis together. As a result, he certainly foresaw all deals between that duo. Those deals included three initial purchases totaling 5 ounces, another 13 ounces from the Mississippi trip, 6 ounces from a deal at Jones' girlfriend's place, 9 ounces from Buford's 18–ounce purchase, and 500 grams from the Memphis deal. All told, those purchases add up to over 1.4 kilos. (Obviously Eston is also liable for those amounts). In addition, Glispie and Eston knew that Buford was Carbondale's leading distributor and resold crack in his own areas of town, so we think it reasonable that the other halves of the purchases Buford made to supply Eston (and Glispie) were foreseeable and within the scope of the conspiracy. That being the case, they are both accountable for at least another 9 ounces plus 500 grams, which would leave them at well over 2 kilos.

Affirmed.